# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1998-CA-01229-SCT

*IN THE MATTER OF THE DISSOLUTION OF JACKSON ARTHRITIS CLINIC AND OSTEOPOROSIS CENTER, P. A., A MISSISSIPPI CORPORATION: JAMES K. HENSARLING, M.D.*

*v.*

*SUTHIN SONGCHAROEN, M. D.*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/17/1998 |
| TRIAL JUDGE: | HON. WILLIAM HALE SINGLETARY |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | JOHN R. McNEAL, JR. |
| | JANICE T. JACKSON |
| ATTORNEYS FOR APPELLEE: | THOMAS L. KIRKLAND, JR. |
| | G. TODD BURWELL |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED ON CONDITION OF ACCEPTANCE OF REMITTITUR WITHIN FIFTEEN (15) DAYS BY SUTHIN SONGCHAROEN, M. D.; OTHERWISE, REVERSED AND REMANDED - 01/27/2000 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 2/17/2000 |

## BEFORE PITTMAN, P.J., MILLS AND WALLER, JJ.

## WALLER, JUSTICE, FOR THE COURT:

### STATEMENT OF THE CASE

¶1. James K. Hensarling and Suthin Songcharoen are medical doctors who practice in the specialized field of rheumatology. Hensarling and Songcharoen were equal and sole shareholders, and the only physician employees, of a corporation, Jackson Arthritis Clinic and Osteoporosis Center, P.A. [hereinafter "the Clinic"], the dissolution of which forms the basis of this suit.

¶2. The corporation was established and managed so that it would have no real earnings; substantially all of the income of the corporation was distributed to the physicians in the form of salary or bonuses. Hensarling and Songcharoen essentially maintained separate practices, except that each physician would see the other's patients if the other were away on business or vacation. Most of each physician's patients came from patient or other physician referrals to the physician individually, and not to the Clinic. The income from each doctor's patients was collected; expenses of the corporation deducted from that sum; and the remainder made available to each physician at their request.

¶3. Both Hensarling and Songcharoen had a monthly salary of $10,000. The remainder of the physicians' income was paid periodically at the physician's request in the form of a bonus. The expenses of the corporation were divided into three different categories: (1) individual expenses, (2) expenses shared equally by the physicians, and (3) expenses calculated in proportion to patient collections.

¶4. At the end of 1996, Hensarling began to experience some personal and licensure problems, and he greatly reduced his working hours and, correspondingly, his income. Hensarling and Songcharoen began to disagree over the management of the Clinic; Hensarling wanted to reduce his monthly expense by cutting down on the overhead of the Clinic, but Songcharoen maintained that she had always paid all of her expenses, even when she was on leave for an extended period of time. Unable to come to any resolution, Songcharoen filed a Petition for Judicial Dissolution, requesting the Chancellor to dissolve the corporation and provide for a way of winding down business and disbursing the assets of the corporation. Hensarling made an election to purchase the stock of Songcharoen, terminating the need for judicial dissolution. However, Hensarling and Songcharoen could not agree on the fair value of Songcharoen's share of the corporation. The Chancellor requested proposed valuators from both parties, who filed a joint designation of valuators. From the list of proposed valuators, the Chancellor appointed Gregory D. Anderson, a CPA with Horne Group in Hattiesburg, Mississippi, to evaluate the corporation and propose a value for Songcharoen's stock in the corporation.

¶5. Anderson conducted a thorough review of the corporation's business and financial records and produced to the Chancellor an extensive report valuing the corporation at $435.00 per share, or $217,000 for Songcharoen's share of the business. Anderson, in giving the background for his analysis, explained the different methods of evaluating a professional corporation and gave an estimated value for the corporation at issue using two different methods. Anderson explained that valuation is not an exact science, and the valuator must use "objectivity, informed judgment and reasonableness" in determining the extent to which each methodology is used, so his final conclusion is derived from a "reconciliation" of multiple methods.

¶6. Dissatisfied with Anderson's valuation, Hensarling requested a hearing at which he presented the testimony of one of the other proposed valuators, Kenneth Lefoldt, Jr., a self-employed CPA from Jackson. Lefoldt disagreed with two aspects of Anderson's valuation and testified that he would not give any value to the goodwill of the corporation, since he believed the corporation has no goodwill by itself because referrals went directly to the individual physician. Also, he would not include the accounts receivable in his valuation of the corporation, since the accounts receivable went to the respective physician and did not stay in the corporation. In his partial findings of fact and conclusions of law with regards to the value of the corporate stock, the Chancellor "was not persuaded by the testimony of H. Kenneth Lefoldt. The Court found no errors and/or omissions in the valuation performed by Greg D. Anderson." Therefore, relying on Anderson's valuation, the Chancellor ordered Hensarling to buy Songcharoen's 500 shares of

stock in the corporation for the value appraised by Anderson.

¶7. Hensarling and Songcharoen also disagreed about the payment of expenses and salaries during the valuation process. From the beginning of the disagreement of the parties in late 1996 until May 4, 1998, when Songcharoen resigned from the corporation, the money collected by the physicians was put into an escrow account. In response to Songcharoen's motion for disbursement of those funds collected and held in escrow from January 1997 through May of 1998, the Chancellor ordered that the money would be disbursed in accordance with the long-standing practice of the Clinic. After a calculation of the respective incomes of the physician and expenses due from each, the money was disbursed to each of the physicians according to what they had individually collected during that period of time.

¶8. Hensarling appeals the Chancellor's judgment to this Court raising two alternative assignments of error:

> **I. The Chancellor's decision to allow the accounts receivable of Jackson Arthritic Clinic and Osteoporosis Center, P.A., to be used as part of the basis of the value of the corporation's stock constituted manifest error and was not supported by substantial credible evidence.**

> **II. The Chancellor applied an erroneous legal standard and erred as a matter of law by denying Dr. Hensarling ownership of the accounts receivable which formed a portion of the value of Dr. Songcharoen's 500 shares of stock in Jackson Arthritic Clinic and Osteoporosis Center, P.A.**

## STATEMENT OF THE LAW

¶9. This Court will not reverse a chancellor's findings of ultimate or evidentiary fact which are supported by substantial evidence in the record. If the chancellor's findings are supported by substantial evidence, we may not reverse unless the chancellor abused his discretion, was manifestly wrong or clearly erroneous or applied an erroneous legal standard. *Brocato v. Brocato*, 731 So. 2d 1138, 1140 (Miss. 1999) (collecting authorities).

¶10. Hensarling alleges that the Chancellor in the instant case made a finding of fact concerning the valuation of the stock that was not supported by substantial credible evidence and/or that the Chancellor applied an erroneous legal standard in disbursing the collected accounts. The crux of this argument is that Songcharoen is unjustly enriched because she received a value for her stock that included accounts receivable, and part of those accounts were later collected and disbursed to her.

> **I. The Chancellor's decision to allow the accounts receivable of Jackson Arthritic Clinic and Osteoporosis Center, P.A., to be used as part of the basis of the value of the corporation's stock constituted manifest error and was not supported by substantial credible evidence.**

¶11. In Anderson's opinion, he valued the corporation at $383,594 using an Asset-Based Approach. Under that method, the corporations assets are valued based on net or liquidation value. In his calculation, Anderson considered an accounts receivable value of $110,653. He also made a determination under a different methodology, a Capitalized Excess Earnings Method, that the corporation was worth $518,198. Under the Capitalized Excess Earnings Method, Anderson simply added an amount representing the intangible value of the corporation, or "goodwill," to the market value of the corporation, which he valued at $383,594 from the Asset-Based Approach. His final conclusion as to the value of the corporation was based on a reconciliation, or a combination, of the two methods, eventually valuing the corporation at a

figure between those two different estimates. Nevertheless, under both methodologies, Anderson included a value for the accounts receivable of $110,653, which formed a basis for the value of the corporation.

¶12. Anderson's opinion as to the value of the corporation appears fair and appropriate, and the Chancellor's reliance on that opinion is not misplaced. Alone, the Chancellor's decision ordering Hensarling to pay half the value of the corporation is not an error. However, when considered in light of the next assignment of error, we find there is reversible error.

> **II. The Chancellor applied an erroneous legal standard and erred as a matter of law by denying Dr. Hensarling ownership of the accounts receivable which formed a portion of the value of Dr. Songcharoen's 500 shares of stock in Jackson Arthritic Clinic and Osteoporosis Center, P.A.**

¶13. In this assignment of error, Hensarling claims that the Chancellor, in disbursing the disputed escrow money to the physicians, erroneously denied him the accounts receivable for which he had already been ordered to pay Songcharoen when he bought her stock in the corporation. At the end of 1997, the physicians had earned over $800,000 in collected fees from patients and drug studies which were being held in escrow until the dispute between the two could be resolved. The Chancellor ordered that this be paid in accordance with the corporation's long-standing method of paying expenses and disbursing income- based on each physician's individual collections. Apparently, that $800,000 in collected fees may have included some or all of the $110,000 in accounts receivable considered by Anderson when he valued the business as of February of 1997. Therefore, Hensarling claims that the Chancellor should have either reduced the value of the stock by half of the erroneously considered accounts receivable or allowed Hensarling to maintain ownership, possession and control of the accounts receivable (in the form of the collected amount) that the Chancellor had ordered him to purchase.

¶14. We find Hensarling's assignments of error to be meritorious. Since, however, it is impossible to determine from the records how much of the accounts receivable were actually collected and disbursed to the physicians, we conclude that a just result in this case is to order a remittitur in the amount of half of the accounts receivable considered in the valuation of the company. Miss. Code Ann. § 11-1-51 (1991) allows for a remittitur if trier of fact has awarded damages that are "contrary to the overwhelming weight of credible evidence." The Chancellor's two orders in this case permit Songcharoen to receive a value for the corporation based, at least in part, on accounts receivable, which she later received in disbursements. A remittitur has the effect of allowing Hensarling to buy Songcharoen's interest in the corporation, without requiring him to pay for accounts receivable which may have been disbursed to her in the later order.

## CONCLUSION

¶15. The Chancellor's factual findings with regards to the value of the corporate stock were based on substantial evidence, as they were adopted from a highly qualified expert jointly recommended by both parties in this case. However, the Chancellor's order that the collections of the corporation be distributed to the physicians according to their long-standing agreement had the effect of divesting Hensarling of a portion of the accounts receivable for which he was required to pay as part of the basis of the value of the stock of the corporation. Therefore, pursuant to Miss. Code Ann. § 11-1-55 (1991), we order a remittitur in the amount $55,326.50 on the order requiring Hensarling to pay $217,500 for 500 shares of the corporation (Hensarling, therefore, is required to pay to Songcharoen $162,173.50 for her 500 shares of the corporation). If Songcharoen accepts the remittitur on the amount she is to receive for her share in the

corporation, then the judgment of this Court would become final within fifteen days and the trial court's judgment, as reduced by the remittitur, would be affirmed. If the remittitur is declined, the judgment below is reversed and this case is remanded to the trial court for a new determination of the value of the corporation to be considered in light of the collected accounts receivable disbursed by order after the appraisal, which was, in part, based on those funds.

¶16. **AFFIRMED ON CONDITION OF ACCEPTANCE OF REMITTITUR OF $55,326.50 BY SUTHIN SONGCHAROEN, M.D., WITHIN FIFTEEN (15) DAYS; OTHERWISE, REVERSED AND REMANDED.**

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., BANKS, SMITH, MILLS AND COBB, JJ., CONCUR. McRAE, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**