# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI
### NO. 1999-CA-00754-COA

**DAN H. SINGLEY, JR.**                                                 **APPELLANT**

**v.**

**JANE K. SINGLEY**                                                 **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 10/08/1998 |
| TRIAL JUDGE: | HON. SARAH P. SPRINGER |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | HENRY PALMER |
| ATTORNEYS FOR APPELLEE: | MARK A. CHINN |
| | WILLIAM D. KETNER JR. |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| TRIAL COURT DISPOSITION: | APPELLANT AWARDED A DIVORCE ON GROUNDS OF UNCONDONED ADULTERY. |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART - 9/26/00 |
| MOTION FOR REHEARING FILED: | 10/10/2000; denied 11/21/2000 |
| CERTIORARI FILED: | 12/5/2000; granted 2/15/2001 |
| MANDATE ISSUED: | |

BEFORE KING, P.J., BRIDGES, AND MOORE, JJ.

BRIDGES, J., FOR THE COURT:

¶1. Hank Singley appeals the final judgment of the Chancery Court of Lauderdale County, Mississippi of his divorce involving the award of rehabilitative alimony, the chancellor's valuation of his dental practice, the chancellor's equitable division of marital property and the admission of certain evidence. We reverse and render the chancellor's award to Jane Singley of alimony and affirm the chancellor's decision as to all other issues.

### I. FACTS

¶2. Hank and Jane Singley were married for twenty-three years and had one son who, at the time of their divorce, was in college on scholarship. Jane admitted to having numerous affairs during her marriage, and Hank was granted a divorce on the ground of uncondoned adultery. He appeals, however, the chancellor's decisions regarding the division of the marital estate, his $70,000 contribution toward the purchase of the marital home which was his inheritance from his mother's estate, and the court's value of Hank's dental practice. Further, Hank asserts that the "Court failed to take into consideration the *Ferguson* principles of equitable distribution by failing to appropriately consider the costs and tax effect of money and the ability of

Dr. Singley to comply with the equitable division ruling," that is, either liquidate assets which would involve tax consequences or borrow money which would involve interest expenses. In addition, Hank challenges the chancellor's award of temporary rehabilitative alimony. Finally, he contests several evidentiary rulings made by the chancellor.

¶3. In her opinion and judgment, the chancellor awarded Jane $1,500 a month in periodic rehabilitative alimony for a period of one year. The chancellor divided the marital estate giving each party fifty percent. The chancellor appointed an expert to valuate Hank's dental practice. Additionally, the chancellor considered the testimony of Chuck Rae, Hank's accountant. However, because the court-appointed expert had expertise specific to the valuation of businesses, while Hank's accountant did not, the chancellor chose to accept the court-appointed expert's valuation of Hank's dental practice at $145,000. It is from these decisions of the chancellor that Hank appeals.

## II. DISCUSSION OF THE ISSUES

### 1. *Division of the marital estate.*

¶4. Hank first challenges the chancellor's division of the marital estate. He asserts that the chancellor erroneously awarded Jane fifty percent of the marital estate on the basis that it was inequitable because she actually received more than fifty percent. Hank contends that equity demands that Jane receive less than fifty percent of the marital estate because she did not contribute to the accumulation of assets, because she was physically absent from the marital home and away from their child for a large amount of time, because she did not contribute to the harmony and stability of the home due to her absences, because her affairs caused her to be absent from the marriage, and because she refused to participate in community activities that would support Hank's professional position. All of this, Hank contends, supports his position that Jane is not entitled to fifty percent of the marital estate. Hank points to *Ferguson v. Ferguson*, 639 So. 2d 921 (Miss. 1994), in which the Mississippi Supreme Court outlined the factors to be considered when dividing marital property. Those factors are:

1. Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:

a. Direct or indirect economic contribution to the acquisition of the property;

b. Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and

c. Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.

2. The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise.

3. The market value and the emotional value of the assets subject to distribution.

4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;

5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;

6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;

7. The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and,

8. Any other factor which in equity should be considered.

*Id.* at 928. In particular, Hank emphasizes that the chancellor erred in dividing the marital property based on the *Ferguson* factor of "substantial contribution to the accumulation of the property . . . direct or indirect economic contribution to the acquisition of the property." *Id.* Hank argues that Jane made absolutely no financial contribution to the accumulation of the marital assets. The chancellor, however, found otherwise. Specifically citing *Ferguson* and *Hemsley v. Hemsley*, 639 So. 2d 909 (Miss. 1994), the seminal supreme court cases defining marital property, the chancellor determined that the "parties employed a division of labor whereby Hank built and developed his dental practice and earned the income for the family, while Jane took care of Hank, the parties' home, and the parties' child, Dan." While the chancellor found that Hank had made most of the direct monetary contributions to the marital estate, there was proof showing that Jane also worked for eighteen years of the twenty-three year marriage.

¶5. An appellate court will not reverse a chancellor's equitable division of marital property absent a determination that the chancellor's decision was manifestly wrong or unsupported by substantial, credible evidence. *Burnham-Steptoe v. Steptoe,* 755 So. 2d 1225, (¶15) (Miss. Ct. App. 1999). Having considered Hank's arguments and the chancellor's findings and rulings, we are unable to conclude that the chancellor was manifestly wrong in dividing the Singley estate. To the contrary, it appears that the chancellor appropriately followed the law and achieved an almost even division of property. In addition, we observe that found in the record is substantial evidence supporting the chancellor's division of marital property. Accordingly, we affirm the chancellor's ruling on this issue.

### 2. *Hank's contribution toward the purchase of the marital home.*

¶6. Secondly, Hank contends that he should be given credit for his $70,000 in inheritance that was used as a down payment for the marital home. At the time their home was under construction Hank received a $70,000 inheritance. Rather than place the money in a separate account, he elected to use the money to reduce the amount needed to finance the home. Hank claims that had he known that Jane had engaged in seven extramarital affairs at that time, he would have not made such a contribution to the marital home. He contends that the chancellor applied the wrong legal standard in addressing this issue.

¶7. Relying on a number of Mississippi cases, the chancellor found that because Hank invested the inheritance into a jointly held asset-the marital home-the funds lost their character as non-marital property and were therefore included in the calculations for property within the marital estate. Assets accumulated during the marriage are considered marital assets. *Hemsley,* 639 So. 2d at 914. Such assets are subject to equitable distribution by the chancellor. *Id.* at 915. However, assets which are classified as non-marital may be converted into marital assets if they are commingled with marital property or utilized for domestic purposes, absent an agreement to the contrary. *Heigle v. Heigle* 654 So. 2d 895, 897 (Miss. 1995);

*Johnson v. Johnson*, 650 So. 2d 1281, 1286 (Miss. 1994). Commingled property is a combination of marital and non-marital property in which the non-marital property has lost its status as non-marital property by virtue of its being combined with the marital property. *Maslowski v. Maslowski*, 655 So. 2d 18, 20 (Miss. 1995).

¶8. Our breadth of review in domestic relations matters is limited. With the familiar rule in mind, that this Court will not disturb a chancellor's findings unless manifestly wrong, clearly erroneous, or if the chancellor applied an erroneous legal standard, *McEwen v. McEwen*, 631 So.2d 821, 823 (Miss. 1994), we are unable to conclude that the chancellor erred in determining that the $70,000 was commingled and became marital property. We affirm the chancellor's decision on this issue.

### 3. *Valuation of Hank's dental practice.*

### A. *Neville v. Neville*

¶9. The chancellor appointed an independent consultant with experience in business valuations to conduct a valuation of Hank's dental practice. Hank, who had his accountant calculate the value of his business, challenges several aspects of the court-appointed valuations expert's report. First, Hank contends that the chancellor improperly relied on a selected portion of the court-appointed appraiser's evaluation in violation of Mississippi law as delineated in *Neville v. Neville*, 734 So. 2d 352 (Miss. Ct. App. 1999). In *Neville*, this Court determined that Mr. Neville was not entitled to a share of his former spouse's professional medical practice as an ongoing business. *Id.* at (¶13). The chancellor in *Neville* refused to award Mr. Neville a share of the medical practice, but was persuaded by Mr. Neville's arguments regarding the disparity in the earning capacities of the parties and awarded him rehabilitative alimony in the amount of $1400 a month for ten years. *Id*. at (¶ 14). We determined that the chancellor was not in error for calculating the value of Dr. Neville's practice as a marital asset and then using the figure in making an equitable distribution of marital assets. *Id.* at (¶15). Here, Jane sought an equitable distribution of the marital assets. The chancellor awarded to Jane, up front, half of the marital property and did not award her a percentage of the future profits of Hank's practice or alimony to remedy the marked difference in her salary as a nurse and Hank's as a dentist. Thus, we find that Hank's reliance on *Neville* is misplaced.

### B. *Goodwill*

¶10. Hank also challenges the business valuation prepared by the court-appointed expert and utilized by the chancellor in her determination of the value of Hank's practice. He argues that the use of goodwill in the evaluation of Hank's practice was inappropriate. This issue having not been addressed by this Court or the Mississippi Supreme Court in the arena of divorce law, Hank urges us to adopt the principle that using goodwill in the valuation of a closely-held business to determine the fair market value of that business is inappropriate in divorce cases.

¶11. In establishing the guidelines for dividing marital property, the supreme court in *Ferguson* acknowledged that:

> Property division should be based upon a determination of *fair market value* of the assets, and these valuations should be the initial step before determining division. Therefore, expert testimony may be essential to establish valuation sufficient to equitably divide property, particularly when the assets are as diverse as those at issue in the instant case.

*Ferguson*, 639 So. 2d at 929 (emphasis added). Accordingly, the chancellor in this case, pursuant to the *Ferguson* guidelines, was required to determine the fair market value of the marital assets of the parties.

¶12. James Koerber was the court-appointed expert. He conducted a thorough review of Hank's business and financial records and produced to the chancellor an extensive report valuing Hank's dental practice at $145,000. Koerber explained in his report that he would determine what the fair market value of Hank's dental practice as it would trade between Hank and an independent third-party purchaser. Using the U.S. Treasury Regulation 20.2031-1(b) and Revenue Ruling 59-60, 1959 1 C.B. 237, Koerber listed the definition of fair market value as:

> The price at which property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, bother parties having reasonable knowledge of the relevant facts.[1]

Keorber explained that in arriving at the fair market value of Hank's dental practice, both tangible and intangible assets would be evaluated. Keorber stated that valuation is not an exact science. Rather he stated that "the informed judgment of the valuator operating in the context of reasonableness and common sense must underlie the valuation process."

¶13. In giving the background for his analysis, he explained the different methods of evaluating a closely-held business and gave an estimated value for Hank's dental practice using three different methods; the Income-Based Approach, the Market-Based Approach, and the Asset-Based Approach. The Income-Based Approach considers the company's value as an investment mechanism, the purpose of which is to produce a monetary return for its owners. The Market-Based Approach, according to Koerber, is market-oriented and compares the value of the business against ownership interests in similar closely-held businesses that have actually been sold. It considers the sales price in relationship to gross revenue, accounts receivable, fixed assets and supplies. Lastly, the Asset-Based Approach values the business assets on net or liquidation value.

¶14. In applying the Income-Based Approach to the circumstances of this case, two methodologies were considered by Keorber: the Capitalized Earnings Method and the Excess Earnings Reasonable Rate Method. The Capitalized Earnings Method considers the estimated amount of future income with a known or assumed rate of return on the investment. Under the Capitalized Earnings Method, Keorber arrived at an investment value of Hank's practice at $87,332. Pursuant to the Excess Earnings Reasonable Rate Method, which is an income and asset approach to valuing a business, Koerber arrived at an investment value of Hank's practice at $80,571.

¶15. The second approach used by Koerber in determining the fair market value of Hank's practice was the Market-Based Approach. Under this approach, Keorber used two methods: the Comparable Sales Transaction Method and the Guideline Public Companies Method. Using the Comparable Sales Transaction Method, where the value of a business is compared to other similar businesses which have actually been sold, Koerber arrived at two different values. First, Keorber used The Institute of Business Appraiser, Inc. database to locate comparable sales of a dental practice. Using this source, Keorber valued Hank's practice at $264,352. Using another source, the 1997 Goodwill Registry produced by The Health Care Group, a value of $143,115 was given to Hank's practice. In his report, Keorber explained that the Guideline Public Companies Method was not useful as his research did not locate any public companies reasonably comparable in the dental industry.

¶16. Finally, Koerber utilized the Asset-Based Approach to value Hank's dental practice. In his report he explained that reliance on this approach is appropriate in limited circumstances. Keorber explained:

The following conditions would indicate appropriateness of using an asset-based approach:

-The company has no earnings history, or its operation cannot be reliably estimated;

-The company depends heavily on competitive contract bids, and there is no consistent, predictable customer base;

-The company has little or no value from labor or intangible assets;

-A significant portion of the company's assets is composed of liquid assets or other investments;

-It is relatively easy to enter the industry; or

-There is a significant chance of losing key personnel, which could have a substantial negative effect on the company.

It is important to examine the dental practice of Dan H. Singley, Jr., DMD based on the above qualifications to determine if a purely asset-based approach is applicable. It appears to be relatively easy for new competitors to enter the market. If the Practice lost Dr. Singley, the Practice could possibly experience a decline in business. We have analyzed an asset-based method for comparative purposes.

Under this approach, the net assets which included the practice's cash, accounts receivable, inventory property and equipment (not the building), and goodwill totaled $148,614, while the practice's liabilities totaled $80,992. In his report Keorber stated:

Again, it is important to note that in the valuation of a closely-held business, no single method is an absolute. To produce a sound conclusion, the professional valuator must use as many or as few of the different methods that are appropriate under the given circumstances of the situation and for which the necessary information is available. Each method can then serve as a reasonableness check on the results of the other methods. Due to the fact that valuation is not an exact science, it is expected that the estimates of value determined by the various methods will not be in exact agreement, but instead will differ from each other to a greater or lesser extent. The valuator uses objectivity, informed judgment and reasonableness in determined the aggregate significance of the individual methodologies considered.

In applying these methodologies, we must not only focus on the quantitative results, but must closely examine the numerous subjective factors influencing the subject Practice and its operating results.

. . .

We have placed varying amounts of reliance on the different methods presented in this report. Accordingly, the final value conclusion is derived from a "reconciliation" of multiple method results, with some methods accorded higher significance and relevance in our final analysis.

¶17. In conclusion, Koerber determined that the fair market value, as defined by Revenue Ruling 59-60, of Hank's dental practice was $145,000. Koerber explained this is the price at which Hank's practice would change hands between a willing buyer and willing seller.

¶18. Interestingly, when Hank was given the opportunity to cross-examine Koerber at trial about his conclusions, he did not question Keorber about calculations of goodwill and its impact on his valuation. The chancellor in her opinion did not specifically address the issue of the inclusion of a value for goodwill in the valuation of Hank's dental practice but accepted the expert's opinion that the fair market value of the dental practice was $145,000.

¶19. We have found that at least once the Mississippi Supreme Court has addressed the valuation of a professional corporation and the argument that goodwill should not be made part of such an evaluation. In *Dissolution of Jackson Arthritis Clinic and Osteoporosis Center*, 755 So. 2d 418 (Miss. 2000), the appellant, Hensarling, had agreed to buy-out the corporation shares of his former partner, Songcharoen. *Id*. at (¶ 4). The parties however disagreed on the value of the corporation and the value of the shares. *Id.* The chancery court appointed an independent valuator to evaluate the corporation and propose a value for Songcharoen's stock in the corporation. *Id.* In assessing the value of the corporation and stock, the valuator used two methods in arriving at his final values. He used the Asset-Based Approach and the Capitalized Excess Earnings Method. *Id.* at (¶11). Under the Asset Based Approach, the valuator valued the corporation based on the business's liquidation or net value. *Id.* Pursuant to the Capitalized Excess Earnings Method, the valuator added the amount representing the corporation's intangible value or "goodwill"to the value he reached at using the Asset-Based Approach. In arriving at a final value, the valuator reconciled the results of the two methods "eventually valuing the corporation at a figure between those two different estimates." *Id.* Hensarling argued that the use of goodwill in the evaluation of the corporation was improper. *Id.* at (¶6). Hensarling presented testimony of one of the other proposed valuators, a self-employed certified public accountant, who testified "that he would not give any value to the goodwill of the corporation, since he believed the corporation has no goodwill by itself because referrals went directly to the individual physician." *Id.* Nonetheless, the chancellor relied on the values reached by the court-appointed expert. *Id.*

¶20. Though the Mississippi Supreme Court reversed the case for other reasons, it held that the valuator's opinion regarding the value of the corporation appeared to be fair and appropriate and determined that the chancellor had not erred in relying on the valuator's opinion. *Id*. at (¶12). In so holding, the supreme court concluded: "The Chancellor's factual findings with regards to the value of the corporate stock were based on substantial evidence, as they were adopted from a highly qualified expert jointly recommended by both parties in this case." *Id.* at (¶15). This case is instructive here because it demonstrates the Mississippi Supreme Court's approval of the use of goodwill in the valuation of a professional business, as the parties in the case were both physicians. Even though it was not a domestic case, the valuation was for the purpose of dividing the corporation between *two* parties.

¶21. The issue of whether "goodwill" is to be used in the valuation of a business for the purpose of determining values for the division of property in divorce cases is a hotly contested issue across the nation. Numerous law journal articles and papers have been written on the subject. And, each jurisdiction having

addressed the issue has placed its own unique spin on how goodwill should be treated. Some jurisdictions hold firmly that goodwill in a closely-held business should not be considered marital property and thus not used in arriving at a value of the business. *See In re Marriage of Claydon*, 715 N.E.2d 1201 (Ill. Ct. App. 1999) (noting that professional goodwill is an aspect of income potential and should be reflected in maintenance awards otherwise additional consideration of goodwill is duplicative and improper); *Yoon v. Yoon*, 711 N.E.2d 1265, 1269 (Ind. 1999) (stating that Indiana law adheres to the rule that goodwill based on the personal attributes of the individual is not properly part of the marital estate). Then there are jurisdictions which delineate the difference between personal goodwill and business goodwill and hold that business goodwill is a matter subject to distribution in a divorce. *See Gaydos v. Gaydos*, 693 A.2d 1368, 1372 (Pa. Super. Ct. 1997) (ruling that lower court was required to value professional goodwill in husband's dental practice and exclude it from marital estate); *Skrabak v. Skrabak*, 673 A.2d 732 (Md. Ct. Spec. App. 1996) (ruling that there was insufficient evidence to support a finding that 50% of anesthesiology practice was "institutional" (or business) goodwill to be included in marital property). Finally, the majority of jurisdictions adhere to the principle that goodwill should be used in evaluating the market value of a business and subject to division in divorce cases. *See Howell v. Howell*, 523 S.E.2d 514 (Va. Ct. App. 2000) (holding that goodwill may be an asset of a professional practice and subject to valuation for equitable distribution purposes; "To hold otherwise would result in a windfall to the professional spouse." (quoting *Russell v. Russell*, 399 S.E.2d 166, 168 (Va. Ct. App 1990)); *Chesterfield v. Nash*, 978 P.2d 551, 555-56 (Wash. 1999) (ruling that professional goodwill is an intangible and distinct asset of a professional practice and not just a factor contributing to the value or earning capacity of the practice); *Endres v. Endres*, 532 N.W.2d 65, 68 (S.D. 1995) (The prevailing view of courts that have considered the question [of goodwill in the division of marital property] is that goodwill of a professional practice or business is a business asset with a determinable value and is marital property subject to division in a divorce proceeding."); *Kahn v. Kahn*, 536 N.E.2d 678, 682 (Ohio Ct. App. 1987) ("Good will is an integral part of the valuation of a professional business in a divorce proceeding.").

¶22. We again observe that regarding issues of property division, the chancellor is given substantial discretion. *Dunaway v. Dunaway,* 749 So. 2d 1112 (¶ 5) (Miss. Ct. App. 1999). We will interfere only if we determine that the chancellor manifestly abused his discretion and a lack of substantial evidence to support the judgment. *Daigle v. Daigle*, 626 So. 2d 140, 144 (Miss.1993). Under this standard, the chancellor had substantial evidence on which to base her decision that Hank's dental practice was worth $145,000. The chancellor did what was required of her in finding the fair market value of the marital asset in Hank's business. She relied on the expert and knowledgeable opinion of one who had substantial expertise in making such valuations. We would be remiss to find that the chancellor erred in her decision.

¶23. The majority of jurisdictions have determined that even in closely held businesses and professional practices goodwill, though intangible and often closely associated with an individual, should be used in valuating that business for property division in divorces. At least one Mississippi case has deemed it appropriate to include goodwill in the fair market value of a professional business. *See Dissolution of Jackson Arthritis Clinic and Osteoporosis Ctr.,* 755 So. 2d 418 (Miss. 2000). Accordingly, we find that the chancellor's reliance on the court-appointed expert's decision was not error.

### C. *Building Equity*

¶24. Hank next maintains that the chancellor's conclusion that he had $250,000 in equity in the building in which his dental practice was located was erroneous. He argues that the parties had previously agreed that

Hank had equity in the amount of $186,000 in the building. This assertion is not supported by the record. Rather, the record shows that Jane believed Hank had equity in the amount of $250,000 in the office building as was shown on certain financial statements produced by Hank.

¶25. Having reviewed the record, we find no error in the chancellor's findings and conclusions on these issues. We likewise find no error in the chancellor's award of equitable distribution. For the reasons we have stated, we affirm the chancellor on this issue.

### 4. *Evidentiary matters*

¶26. Hank asserts that the chancellor made three errors in ruling on the admissibility of evidence. First, he argues that the chancellor should have admitted the testimony of Chuck Rae, Hank's certified public account. In support of his position he cites Mississippi Rule of Evidence 702. Rule 702 governs the admissibility of expert testimony stating that such testimony is permitted to assist the trier of fact to understand the evidence or determine facts in issue. In this case, the chancellor ruled that Mr. Rae was not an expert in business evaluations. The chancellor recognized that Mr. Rae was a certified public account and was qualified to speak on matters pertaining to those involved in the accounting of Hank's dental practice and the accounting of Hank's business contained in the court-appointed expert's report. Having reviewed the record and the chancellor's rulings, we find no error in her decision in not qualifying Mr. Rae as an expert in the field of business evaluations.

¶27. Next, Hank asserts that the court should have accepted the value of his office building as agreed to by the parties. Hank cites no law or rule in support of his argument. "Failure to cite relevant authority obviates the appellate court's obligation to review such issues." *Burnham-Steptoe,* 755 So. 2d at (¶14). Accordingly, we decline to address this issue.

¶28. Finally, Hank contends that the chancellor should have granted his post trial motions. Again, Hank cites no law in support of his contention. Again, we are not obliged to address this issue because Hank failed to cite any law whatsoever in support of his argument. *Id.* Nonetheless, having reviewed his post trial motion requests and the record on appeal, we find no merit in this assignment of error.

### 5. *Award of temporary rehabilitative alimony.*

¶29. In her opinion and judgment, the chancellor determined that Jane was entitled to temporary rehabilitative alimony in the amount of $1500 a month for a period of one year. The chancellor noted Hank's objection to the court hearing any evidence on this issue because, according to Hank, the matter was not included in the pre-trial statement submitted by the parties prior to trial. He asserted then, as he does now, that he was not prepared to address issues involving alimony because Jane did not indicate in the pre-trial statement that she intended on demanding such relief. At trial, the chancellor denied Hank's request to limit the issues to those found in the pre-trial statement. In her opinion, the chancellor found that Jane's counterclaim for divorce contained language requesting periodic and lump sum alimony. Interpreting Rule 8 (f) of the Mississippi Rules of Civil Procedure which requires that a pleader state that she is entitled to the relief demanded, the chancellor concluded that Jane's counterclaim constituted sufficient notice to Hank that she demanded and was entitled to alimony. The chancellor ruled that the order entered involving the pretrial statement was not the "type of order contemplated by Rule 16." She further ruled that the approval of the pretrial statement did not remove from consideration Jane's request for alimony.

¶30. In response, Jane contends that Hank "admits" that she pleaded for equitable distribution, lump sum and periodic alimony. Jane states: "As a matter of law, this pleading established periodic support as an issue in the case." Other than making this statement, Jane does not support this allegation with citations of law or rules. In her brief she continued: "If Hank was prepared only to litigate 'a case involving equitable distribution factor, not alimony' as he asserts in his Brief on page 27, then he has only himself to blame. He admits that Jane requested alimony, thereby making alimony an issue in the case."

¶31. Mississippi Rules of Civil Procedure Rule 16 provides:

> In any action the court may, on the motion of any party, and shall on the motion of all parties to the cause, direct and require the attorneys for the parties to appear before it at least twenty days before the case is set for trial for a conference to consider and determine:
>
> (a) The possibility of settlement of the action;
>
> (b) the simplification of the issues;
>
> (c) the necessity or desirability of amendments to the pleadings;
>
> . . .
>
> (l) such other matters as may aid in the disposition of the action.
>
> The court may enter an order reciting the action taken at the conference, the amendments allowed to the pleadings, and the agreements made by the parties as to any other matters considered, and limiting issues for trial to those not disposed of by admissions or agreements of counsel; and such order when entered shall control the subsequent course of the action, unless modified at the trial to prevent manifest injustice.

Rule 16 is patterned after the Federal Rules of Civil Procedure Rule 16. In construing our rules, especially where this Court nor the Mississippi Supreme Court has had the opportunity to interpret a rule, we look for guidance to the federal cases where a similar federal rule has been construed. *Bourn v. Tomlinson Interest, Inc*., 456 So. 2d 747, 749 (Miss. 1984) (construing M.R.C.P. 56).

¶32. The federal courts have consistently stated that once a pre-trial order is entered, it becomes controlling and is binding on the parties to the actions. *Portis v. First Nat'l Bank of New Albany*, 34 F.3d 325, 332 (5th Cir. 1994); *Hodges v. United States*, 597 F.2d 1014, 1017 (5th Cir. 1979); *Funding Sys. Leasing Corp. v. Pugh*, 530 F.2d 91, 95 (5th Cir. 1976). Interpretation of the pre-trial order and whether to permit modifications to the order to avoid manifest injustice are decisions within the sound discretion of the trial judge. *Portis,* 34 F.2d at 32; *Hodges*, 597 F.2d at 1018. A pre-trial order supersedes the prior pleadings and thereafter controls subsequent limitation. *Barvick v. Cisneros*, 953 F. Supp. 341, 344 (D. Kan. 1997).

> Although judges and lawyers often think in terms of the pretrial order's impact on the actual trial of a case and the issues which are disposed of in that context, its purposes of bringing certainty concerning the issues to be determined and preventing unfair surprise are just as much appropriate to delineating the contours of post trial relief, especially where that relief is not implicit in the claims and defenses otherwise expressly preserved.

*Id.*

¶33. Other jurisdictions have also utilized the federal interpretations and applications of Rule 16 in cases involving divorces and matters of division of property. In *Slade v. Slade*, 682 N.E.2d 1385, 1387 (Mass. App. Ct. 1997), the Massachusetts Appeals Court reversed a judgment where the issues involved were the appropriate division of certain items of personal property. The court in *Slade* determined that the judge deviated from the terms of the pretrial order to address an issue that was neither contested nor litigated by the parties. The court held that all parties were surprised and the husband was significantly prejudiced by the judge's actions. *Id.* Accordingly, Massachusetts appellate court determined that it was an abuse of the judge's considerable discretion to address an issue not found within the express terms of the pretrial order. Likewise, *Johnson v. Johnson*, CN98-06600, 1999 WL 692066 (Del. Fam. Ct. April 5, 1999), a Delaware court held that because "the issue of alimony was not listed in the controlling pretrial Order, the parties effectively waived their rights to alimony and the Court did not permit the issue to be argued at trial." *Id.* at *6.

¶34. In this case, the pre-trial statement approved by the chancellor expressly stated that the issues to be determined at trial were the grounds of the divorce, what assets were to be included in the marital estate, and what portion of the martial estate was Jane entitled to receive. Under the defendant's section of what the contested issues were was this statement:

> Under Mississippi Law, Defendant can not be punished for fault in the division of assets. Adulterous conduct does not preclude her from recovering an equitable division of the marital estate including a distribution from the dental practice. This is a long marriage and Defendant's fair portion of the assets if [sic] 50 %.

Nowhere in the pretrial statement does Jane indicate that alimony was an issue to be tried. Having reviewed the pretrial statement approved by the chancellor it is difficult to see how such a document is one which was *not* contemplated by Rule 16.

¶35. Interestingly, the chancellor did not make nor was asked to make a finding that manifest injustice would result from Jane's apparent unintentional waiver of her claim to alimony. Rule 16 allows for modification of the pre-trial order by the trial court where it is found that manifest injustice would result. M.R.C.P. 16. At trial and in response to Hank's objection, counsel for Jane indicated that it was not his intention that the evidence introduced at trial would be limited by the terms of the pretrial order. Counsel for Jane argued that he and counsel for Hank explored settlement possibilities for many months and could not reach an agreement. In so arguing, counsel stated: "we got down to the last days [before trial] and we basically notified him on Thursday and Friday in so many words, all bets are off, we're going full blown on this when [at trial] we can't seem to narrow anything." Further, counsel asserted:

> And I think that the pretrial order is an excellent mechanism for parties to try to get together and narrow the issues, but I never anticipated that when I placed in the statement of facts that we sought a divorce on the grounds of adultery, that we would not be permitted to get a divorce because we didn't put that in the contested issues section.

¶36. Hank, however, vehemently argued prejudice and surprise that alimony was a contested issue. As stated, he asserted then as he does now that he was unprepared at trial to defend the issue that Jane was entitled to alimony.

¶37. At trial, the chancellor ruled:

> Well, I think that this is a court of equity and it would be unfair to totally limit either side to a specific item in the pretrial order and the Court should consider the totality of the circumstances to be fair to both parties and to do equity and the Court will allow you to present that evidence [of alimony].

¶38. We rule the chancellor abused her discretion in determining that the issue of alimony was a matter properly before it. The pre-trial statement was produced by a joint effort of the parties and approved by the chancellor and entered by order of the chancellor. It was unambiguous and clear and it complied substantially with the M.R.C.P. 16. Accordingly, we find that it was a mutual agreement of the parties as to the contested issues and was binding on the parties and the court absent a modification pursuant to Rule 16.

¶39. In conclusion, we rule that any modification of the pre-trial order should have been made in the same manner as originally done, by mutual agreement or upon a finding by the chancellor of manifest injustice. Consequently, the chancellor's award of rehabilitative alimony is reversed and rendered.

¶40. **THE JUDGMENT OF THE CHANCERY COURT OF LAUDERDALE COUNTY AWARDING APPELLEE $1500 A MONTH IN ALIMONY FOR 12 MONTHS IS REVERSED AND RENDERED. THE JUDGMENT OF THE CHANCERY COURT ON ALL REMAINING ISSUES IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED ONE HALF TO THE APPELLANT AND ONE HALF TO THE APPELLEE.**

> **KING, P.J., IRVING, LEE, MOORE, MYERS, PAYNE, AND THOMAS, JJ., CONCUR. McMILLIN, C.J. AND SOUTHWICK, P.J., NOT PARTICIPATING.**

1. The Mississippi Supreme Court has also used a similar definition of fair market value. *See Crocker v. Mississippi State Highway Comm'n*, 534 So. 2d 549, 552 (Miss. 1988); *Mississippi State Highway Comm'n v. Hillman*, 189 Miss. 850, 869, 198 So. 565, 571 (1940).